**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 25, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

CAMILLE MAE KRAMER,

       Plaintiff - Appellant,

v.

WASATCH COUNTY SHERIFF'S
OFFICE; WASATCH COUNTY;
KENNETH VAN WAGONER,
Wasatch County Sheriff,

       Defendants - Appellees,

and

BRIAN GARDNER, Wasatch County
Detective; JOHN DOE I THROUGH
X,

       Defendants.

No. 12-4058

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:08-CV-00475-TC)**

---

Kathleen McDonald (Lynn C. Harris with her on the briefs) of Jones Waldo
Holbrook & McDonough PC, Salt Lake City, Utah, for Plaintiff-Appellant.

Kristin A. VanOrman (Jeremy G. Knight with her on the brief) of Strong and
Hanni, Salt Lake City, Utah, for Defendants-Appellees.

---

Before **BRISCOE**, Chief Judge, **SEYMOUR**, and **BACHARACH**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

Camille Kramer sued the Wasatch County Sheriff's Department, her former employer, for sexual harassment under Title VII of the Civil Rights Act and 42 U.S.C. § 1983. She appeals from the district court's grant of summary judgment to Wasatch County on all claims. We affirm summary judgment as to the § 1983 claim but reverse on the Title VII claim, which we remand for trial for the reasons explained below.

**I**

On review of summary judgment, we recite the facts in the light most favorable to Ms. Kramer, the nonmovant. *Morris v. City of Colo. Springs,* 666 F.3d 654, 660 (10th Cir. 2012). Viewed in that light, the facts are as follows.

Camille Kramer worked for the Wasatch County Sheriff's Department from 2005 to 2007, first as a jailor and later as a bailiff. In 2005, while working in the jail, Ms. Kramer was subjected to offensive comments about her breasts, saw sexually offensive material on workplace computers, and frequently heard graphic sexual conversations. Ms. Kramer's perception was that the male employees who engaged in this kind of conduct were not punished but instead were ultimately

promoted, and that female employees who complained were given undesirable assignments and otherwise retaliated against. Ms. Kramer also experienced non-sexual harassment from her jail co-workers.

In 2006, Ms. Kramer complained about the sexual and non-sexual harassment to Sheriff Kenneth Van Wagoner, the head of the Sheriff's Department.[1] Sheriff Van Wagoner told Ms. Kramer he'd "take care of it." Aplt. App. at 55. His response was to convene a staff meeting at which he asked for a volunteer. When Ms. Kramer volunteered, the Sheriff acted out the exact harassing scenarios she had described to him, using her in the role of the victim. The Sheriff told the group: "[t]hat's harassment. Don't do it." *Id.* at 56. Ms. Kramer found the Sheriff's method humiliating and ultimately ineffective. She testified that the harassment got worse after the meeting. When she complained to the Sheriff that the jail harassment had not stopped, he told her "[y]ou might want to avoid that area." Aple. Supp. App. at 170.

Later in 2006, Ms. Kramer was assigned to the courthouse to work as a bailiff. Ms. Kramer was certified under Utah's law enforcement officer training

---

[1] The district court said it was "not clear" whether Ms. Kramer's complaint to the Sheriff had to do with sexual or purely non-sexual harassment. *Kramer v. Wasatch Cnty.*, 857 F. Supp. 2d 1190, 1199 (D. Utah 2012). However, the Sheriff testified that he gave a training session regarding sexual harassment in response to the complaint. Moreover, we are required to accept Ms. Kramer's version of the facts for summary judgment purposes, so we assume that Ms. Kramer's complaint related to the sexual as well as non-sexual harassment to which she had been subjected.

standards (POST[2]), and her goal was to be promoted to a "road officer" position.

She believed the bailiff position would provide her with the opportunity to obtain

the road experience she needed to help her secure that promotion because it

involved transporting prisoners. There were three bailiffs: Sergeant Rick

Benson, who supervised the bailiffs, Ms. Kramer, and Brad Hulse, an employee

who had some seniority over Ms. Kramer but was below Sergeant Benson. The

district court described their roles in the hierarchy as follows:

> The bailiffs, under Sergeant Benson's direction, were in charge of
> security at the courthouse, including maintaining a security presence
> in the courtrooms . . . . Sergeant Benson's job duties included
> managing the other two bailiffs, scheduling, delegating tasks such as
> monitoring the magnetometer, transporting and managing prisoners
> in court, and serving warrants. . . . He also wrote [Ms. Kramer's]
> performance evaluations, which were submitted to Captain Rogers
> and then to Sheriff Van Wagoner for review. . . . Only Sheriff Van
> Wagoner had the authority to hire, fire, promote, and demote
> employees. Sergeant Benson, however, had authority to make a
> recommendation to the Sheriff about demoting, promoting, or firing
> Ms. Kramer.

*Kramer*, 857 F. Supp. 2d at 1195. In addition to controlling Ms. Kramer's

schedule and conducting her performance reviews, Sergeant Benson controlled

whether she would get the road experience she wanted.

As soon as Ms. Kramer started working for Sergeant Benson, he began his

campaign of sexual harassment. He repeatedly asked Ms. Kramer to give him a

foot rub, which she consistently refused to do. After her efforts to diffuse the

---

[2] POST stands for Peace Officer Standards and Training.

situation were fruitless, she jokingly told him she would give him a foot rub only if he brought in a doctor's note. Apparently not one to take a hint, Sergeant Benson brought in a purported doctor's note on prescription paper, which said "Camille is to rub Rick Benson's feet three times a day." *Id.* at 1202. Ms. Kramer posted this note on the wall.

Ms. Kramer testified in her deposition that at this point Sergeant Benson's foot-rub harassment became "intimidating and kind of scary." Aplt. App. at 88. Although she complained about it to Sheriff Van Wagoner's secretary, Rae Davis, saying "I can't believe he really expects me to give him a foot rub," *id.* at 89, Ms. Davis apparently did not convey anything about the foot-rub harassment to the Sheriff, who testified that he was never made aware of it and that he never saw the "doctor's note" posted on the wall. Ms. Kramer told Sergeant Benson that she thought the joke had gone too far, asked him to stop, and reiterated that she had no intention of rubbing his feet. She did not file a formal complaint with the Sheriff at the time because, based upon what she had seen in the jail, she believed that complaints about sexual harassment would prevent her from being promoted and might cause adverse action to be taken against her.

Because Ms. Kramer refused to rub his feet even after he had brought in the "doctor's note," Sergeant Benson started calling her a liar. His continued demands for a foot rub, augmented by accusations of lying, caused Ms. Kramer increasing distress. She finally capitulated: "If I give you a foot massage," she

told Sergeant Benson, "will you just shut up about it?" *Id.* at 90. Sergeant Benson said he would stop harassing her if she came to his house and gave him a foot massage, so Ms. Kramer agreed to do this. While she was at his house rubbing his feet, Sergeant Benson promised Ms. Kramer that he would take her out for the road training she wanted as soon as he could. But after she finished with the foot massage, Sergeant Benson grabbed her, pulled her on top of him, and tried to kiss her. She resisted, asking, "[w]hat are you doing?" *Id.* at 91. She freed herself from Sergeant Benson and left his house.

Ms. Kramer decided not to report this sexual assault to the Sheriff because she believed Sergeant Benson had complete control over her job and feared she would be demoted if she said anything. She also assumed that complaining would be ineffective given what she had seen other women experience in the jail and what had occurred in response to her earlier complaint to the Sheriff.

Ms. Kramer still hoped that Sergeant Benson would take her out for road training as he had promised, but he did not. Instead, he took Brad Hulse (who had a lower POST certification than Ms. Kramer) for road training, which frustrated Ms. Kramer. She continued to ask Sergeant Benson for road training, and he finally agreed. Once in his patrol car, however, Sergeant Benson sexually assaulted Ms. Kramer – twice. After each assault, he told her "don't act weird. Don't act weird on me." *Id.* at 98-99. She did not complain to the Sheriff after this incident for the reasons already noted.

Sergeant Benson's actions toward Ms. Kramer at work subsequently became more retaliatory and controlling. He started denying her requests for leave. On one occasion, she had to reschedule her son's surgery after Sergeant Benson approved and then denied the leave time. Ms. Kramer testified that Sergeant Benson would also "watch which way I went home." *Id.* at 107. If she deviated from the route she normally took, he would send her text messages or call her cell phone while she was driving, asking where she was going and why she was not going straight home.

In June 2007, Ms. Kramer posted a sign at her desk that said "Sexual harassment will not be tolerated, it will be graded." *Id.* at 152-53. Someone (it is unclear whom) reported this sign to the Sheriff, saying he or she found the sign offensive. The Sheriff did not ask Ms. Kramer why she had the sign or whether she had experienced additional sexual harassment. He did not mention that the County had a no-sexual harassment policy, tell her she had a right to a workplace free from sexual harassment, offer the County's support, or explain to her how she could complain about sexual harassment through appropriate channels. Instead, he admonished her to take the sign down and wrote a disciplinary note, which he placed in her file.

Ms. Kramer mentioned to her co-workers that as a single mother she sometimes supplemented her income by cleaning houses. Sergeant Benson frequently asked Ms. Kramer to clean his house for money; for obvious reasons,

she always refused this request. These refusals started another campaign of harassment. Sergeant Benson began telling co-workers that Ms. Kramer thought she was "too good" to clean his house, even though she needed the money. Co-workers got into the act, saying "that's good money. Why aren't you [going to clean Sergeant Benson's house]?" *Id.* at 100. Ms. Kramer finally agreed to do so when he promised that his daughter would be there, that she could bring her kids, that she could have his daughter's old clothes for her daughter, and that he would give her money for gas. Unfortunately, not even this arrangement deterred Sergeant Benson. While the children were playing outside and Ms. Kramer was vacuuming his room, Sergeant Benson cornered her in the closet, pushed her against the wall, and raped her. Immediately afterward he said, "This is wrong. I can't believe you made me do this." *Id.* at 104-05. He then repeated his refrain: "Don't act weird." This time, he added a more specific threat, stating "You better be quiet about this and not say anything. This is a career ender." *Id.* at 105.

After the rape, Sergeant Benson continued to act at work in ways that Ms. Kramer found controlling and intimidating. He failed to relieve her on several occasions even though he had promised to do so, causing her to miss important family events. He prepared a bad performance evaluation of her and showed it to her. She argued with him about it and he changed the marks to better ones, saying "keep [your] mouth shut and not say anything, and [you will] be fine and . . . taken care of." *Id.* at 112.

At some point after the rape, some money disappeared from the courthouse. The Sheriff asked state detectives to investigate Ms. Kramer, Sergeant Benson, and a few other County employees who worked in the area where the money had disappeared. *Id.* During this time (ostensibly because she was being investigated), Sergeant Benson assigned Ms. Kramer to work the magnetometer full-time – an undesirable assignment that eliminated the possibility of road training. Sergeant Benson also persistently accused Ms. Kramer of taking the money, telling her that everyone thought she was the culprit. These accusations and rumors distressed and embarrassed Ms. Kramer. She agreed to take a lie detector test, and on the day of the test Sergeant Benson told her, "You better not say anything about anything that happened. . . . It's a career ender . . . [a]nd if I go down, you go down." *Id.* at 121. Ms. Kramer did not speak of Sergeant Benson's sexual assaults during the test, which she passed. Later that day, Sergeant Benson called Ms. Kramer six times on her cell phone; she did not answer his calls. Of all the suspected courthouse employees, Sergeant Benson was the only one who refused to take a lie detector test.

During the money investigation, Ms. Kramer made other observations reinforcing her belief that the Sheriff could not be relied upon to enforce County policies against Sergeant Benson. First, knowing that the Sheriff had ordered Sergeant Benson to stay out of the justice of the peace courtroom because he had been intimidating the female clerks there, she saw him deliberately disregard this

order by entering the courtroom in question. She noticed that the Sheriff imposed no discipline on Sergeant Benson for disobeying the order. Second, the Sheriff denied her administrative leave under circumstances in which it appeared to be authorized. Being investigated by the County and accused of theft by Sergeant Benson caused Ms. Kramer so much distress that she decided to request administrative leave. The policy manual she consulted stated that an employee being investigated could be put on administrative leave, so Ms. Kramer went to Sheriff Van Wagoner and asked to be given paid or unpaid leave, whichever he preferred. The Sheriff refused, telling Ms. Kramer, "we're too small a department" to follow that policy. *Id.* at 58-59.

The final sexual assault occurred while Sergeant Benson was on leave after a surgery. He would call the court frequently from his house, usually asking to speak to Ms. Kramer. He would give her job-related instructions (such as telling her which inmates to transport), and would end the calls by instructing her to come to his house and bring him a Coke. Ms. Kramer always refused the last instruction, so Sergeant Benson asked Deputy Brad Hulse to assist him in bothering Ms. Kramer about it. Mr. Hulse started badgering Ms. Kramer to "bring your laid-up sergeant a Coke." *Id.* at 124. Finally, she capitulated and went to Sergeant Benson's house with a Coke. She thought she would be safe from sexual assaults because he was confined to bed, but she made sure to stay in the doorway just in case. She placed the Coke down near the door and then tried

to leave. But Sergeant Benson had other plans. He repeatedly asked her to sit on the bed, saying "Kramer, can we just talk about work?" *Id.* at 125. When she came near where he was lying, he grabbed her, exposed his penis, pulled her on top of him, and groped her.

Shortly after this incident, Ms. Kramer was in a serious car accident and took sick leave. When some of the court clerks came to visit her, she told them about Sergeant Benson's sexual assaults, including the rape. She also confided in them that she was having a consensual affair with another man and was pregnant as a result, but she refused to disclose his name. The clerks urged her to report Sergeant Benson's sexual assaults to someone. They suggested that she talk about it with Detective Todd Hull, who was investigating the missing money. Ms. Kramer did not want to speak to Detective Hull about the issue but agreed to allow Mindy Probst, one of the clerks, to tell Detective Hull about Sergeant Benson's harassment and assaults.

Sheriff Van Wagoner subsequently found out from one of the court clerks or secretaries (he can't remember whom) that Ms. Kramer was pregnant and that, in the Sheriff's words, "Rick Benson had sexually assaulted her or . . . some sex, or . . . sexual misconduct had taken place, leading me to believe that maybe Rick was the father. And if that was in fact the case, that's a definite violation of our policy and procedure . . . especially if it's on-duty." Aple. Supp. App. at 166. The Sheriff testified that he started an internal investigation into possible "sexual

-11-

misconduct" between Sergeant Benson and Ms. Kramer, which he assigned to Detective Brian Gardner because he was "the unfortunate guy that was on-duty on that particular day." *Id.* at 167. Detective Gardner was not a human resources specialist and was "probably" not trained in conducting sexual harassment investigations. *Id.* at 168. The Sheriff did not provide Detective Gardner with any "policy or procedures on how to conduct the investigation" because, according to the Sheriff, "We don't have any real hard-set investigative standards policy that, other than what the state has and the federal government has put out, as far as sexual harassment." *Id.* at 171-72. This ad hoc process reflected the fact that "[the Department doesn't] have many complaints." *Id.* at 168.

It is undisputed that Detective Gardner's investigation focused almost entirely on discovering who was the father of Ms. Kramer's baby. It is also undisputed that the investigation culminated in Ms. Kramer being disciplined for having consensual sex with her paramour, a County firefighter named Layne Clyde, while he (but not she) was on duty. Ms. Kramer had no intention of disclosing the identity of Mr. Clyde until Detective Gardner told her during his interview that no one would believe her claim that Sergeant Benson had raped her unless she disclosed who her baby's father was. When she grudgingly confessed to her affair, Detective Gardner asked her how many times she and Mr. Clyde had sex and in which locations. Ms. Kramer "felt like it became an interrogation and an investigation on me and my sex life with Layne [Clyde], which had nothing to

do with the investigation with Rick [Benson]." Aplt. App. at 130. Indeed, Ms. Kramer does not remember Detective Gardner asking her about Sergeant Benson at all, other than warning her that her rape allegations would not be believed unless she admitted to, and gave intimate details about, her consensual affair with the other man. "[T]he purpose of the meeting," Ms. Kramer believed, "[w]as to find out who the father of my baby was . . . . [It felt like] I was being investigated for having sex and being pregnant." *Id.* at 131-32.

After hearing from Detective Gardner about the allegations of rape, the Sheriff transferred the "sexual misconduct" investigation from Brian Gardner to Todd Hull, the state detective handling the missing money investigation. Detective Hull and others interviewed Ms. Kramer about Sergeant Benson's sexual assaults. According to the Sheriff, this is where his Department's sexual harassment investigation ended.

The Sheriff's only internal response, other than turning over the investigation to state detectives, was to report to POST that Ms. Kramer had an affair with Layne Clyde. Because she and Mr. Clyde had been intimate while he (but not she) was on duty, POST suspended Ms. Kramer's certification for six months for actions unbecoming an officer. The Sheriff decided that it would be best if Ms. Kramer resigned – to save face for her, the Sheriff's Department, and Layne Clyde, who was married and had children. Ms. Kramer overheard the Sheriff telling Detective Gardner that she should resign. Detective Gardner, on a

-13-

follow-up visit, told her numerous times that she should resign. Ms. Kramer believed the Sheriff had reported her affair to POST to get her decertified because "they clearly didn't want me to come back because I had told on Rick." *Id.* at 136. Although the Sheriff had decided to terminate Sergeant Benson, Sergeant Benson resigned before that could happen.

After Ms. Kramer told Detective Hull what Sergeant Benson had done to her, Detective Hull sent his report to the County Attorney's office. The County Attorney excused himself from prosecuting Sergeant Benson "due to a friendly relationship with Benson." *Id.* at 171. There is no evidence Sergeant Benson was ever prosecuted. Ms. Kramer never returned to work for the Sheriff's Department.

Ms. Kramer sued the County, alleging that the sexual harassment she experienced at the hands of Sergeant Benson constituted sex discrimination prohibited by both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1), and the Constitution, 42 U.S.C. § 1983. The district court granted summary judgment to Wasatch County. The court held that Sergeant Benson was not Ms. Kramer's supervisor for Title VII purposes because he did not have the actual authority to unilaterally fire her. It further held that supervisor status could not be premised on apparent authority because no reasonable juror could find Ms. Kramer reasonable in believing Sergeant Benson had the power to fire her. Even assuming Sergeant Benson was Ms. Kramer's supervisor, the court concluded that

Wasatch County was not vicariously liable for his conduct because Ms. Kramer suffered no tangible employment action and, alternatively, because Wasatch County was entitled to prevail on its *Faragher/Ellerth* affirmative defense as a matter of law. Finally, the court held that Wasatch County was not negligent and thus could not be liable for Sergeant Benson's harassment under co-worker harassment standards. As to Ms. Kramer's § 1983 claims, the court determined that Sheriff Van Wagoner was entitled to qualified immunity, and that the County was not liable because it had no pattern, practice, or custom of illegal sex discrimination.

Ms. Kramer appeals on all grounds.

**II**

We review a grant of summary judgment de novo. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). "[W]e will affirm the district court's disposition only if our independent review of the record, viewing the facts in the light most favorable to [the nonmoving party], reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1207 (10th Cir. 2010) (citing FED. R. CIV. P. 56).

Sexual harassment in the workplace is a form of sex discrimination prohibited by Title VII. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th

Cir. 1998); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72-73 (1986).  In general,

"an employer is directly liable for an employee's unlawful harassment if the

employer was negligent with respect to the offensive behavior."  *Vance v. Ball*

*State Univ.*, 133 S. Ct. 2434, 2441 (2013).  If the harasser is a supervisor rather

than merely a co-worker, however, the employer may be vicariously liable for the

conduct, depending on the circumstances.  *Id.*  If the supervisor's harassment

culminates in a "tangible employment action," the employer is strictly liable for

sex discrimination, with no defense.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 762-63 (1998).  If no tangible employment action occurs, the employer may

still be vicariously liable for the supervisor's harassment if the plaintiff proves

the harassment was severe or pervasive, *Morris*, 666 F.3d at 663, and the

employer is unable to establish the affirmative defense announced in *Faragher v.*

*City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Ellerth*, 524 U.S. at 765.[3]  *See*

*also Vance*, 133 S. Ct. at 2439.  For these reasons, whether the harasser was a

"supervisor" within the meaning of Title VII is a critical threshold question in

determining whether the employer can be held vicariously liable for the

harassment.

## A.  Supervisory control under Title VII

In *Ellerth*, the Supreme Court explained that a harasser may be considered

---

[3] Whether the harassment was sufficiently severe or pervasive is not disputed on appeal.

a supervisor if he or she possesses some amount of actual or apparent authority over the employee. 524 U.S. at 759, 761. But the Court did not specify exactly how much authority a harasser had to have (or appear to have) to qualify as a supervisor, and the circuits were split in answering that question.[4] While Ms. Kramer's appeal was pending before this court, the Supreme Court resolved that circuit split in *Vance*, 133 S. Ct. at 2443. The Court held that a "supervisor" under Title VII is an employee whom "the employer has empowered . . . to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

---

[4] The Second, Fourth, and Ninth Circuits held that a supervisor for Title VII purposes is one who has the power to direct the plaintiff's daily work activities. *See Mack v. Otis Elevator Corp.*, 326 F.3d 116, 125 (2d Cir. 2003); *Whitten v. Fred's, Inc.*, 601 F.3d 231, 245 (4th Cir. 2010); *Dawson v. Entek Int'l*, 630 F.3d 928, 940 (9th Cir. 2011). The First, Seventh, and Eighth Circuits, by contrast, defined supervisor more narrowly to refer only to someone with the power to take tangible employment actions – such as hiring, firing, demoting, promoting, transferring, or disciplining the victim. *See Noviello v. City of Bos.*, 398 F.3d, 76, 95-96 (1st Cir. 2005); *Parkins v. Civil Constructors of Ill.*, 163 F.3d 1027, 1034-1035 (7th Cir. 1998); *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004). We appear to have taken a hybrid approach finding supervisor status in a harasser who was "in charge of delegating duties and assigning work to plaintiff," but who was also "involved in the disciplinary process." *Harrison v. Eddy Potash Inc.*, 248 F.3d 1014, 1016 (10th Cir. 2001); *see also Rubidoux v. Colo. Mental Health Inst.*, 173 F.3d 1291, 1292-93 (10th Cir. 1999) ("[Supervisor] could not alone make hiring and firing decisions, [but] interviewed both plaintiffs, and his recommendation was 'quite possibly' the sole basis for their hiring . . . . [He] set schedules, granted leave, conducted performance reviews, and could initiate hearings to formally consider employee performance.").

significant change in benefits.'" *Id.* (quoting *Ellerth*, 524 U.S. at 761).

Importantly, however, the Court explained that an employee need not be

empowered to take such tangible employment actions directly to qualify as a

supervisor. A manager who works closely with his or her subordinates and who

has the power to *recommend* or otherwise substantially influence tangible

employment actions, and who can thus indirectly effectuate them, also qualifies as

a "supervisor" under Title VII. *Id.* at 2452.

The holding in *Vance* is consistent with the Court's decision in *Staub v.*

*Proctor Hospital*, 131 S. Ct. 1186 (2011). There the Court held that employers

could be liable for tangible employment actions influenced by a biased

subordinate, even though the final decisionmaker was unbiased. *Staub* reasoned

that to hold otherwise would defeat the purpose of employment discrimination

laws.

> An employer's authority to reward, punish, or dismiss is often allocated
> among multiple agents. The one who makes the ultimate decision does so
> on the basis of performance assessments by other supervisors.
> [Defendant's] view would have the improbable consequence that if an
> employer isolates a personnel official from an employee's supervisors,
> vests the decision to take adverse employment actions in that official, and
> asks that official to review the employee's personnel file before taking the
> adverse action, then the employer will be effectively shielded from
> discriminatory acts and recommendations of supervisors that were *designed*
> *and intended* to produce the adverse action.

*Id.* at 1192-93 (emphasis in original).

The Court applied the same logic in *Vance* when it defined supervisor for

Title VII purposes, explaining that an employer who "concentrates all decisionmaking authority in a few individuals[] . . . likely will not isolate itself from heightened liability under *Faragher* and *Ellerth*." 133 S. Ct. at 2452. This is so, the Court explained, because when the individuals vested with actual decisionmaking power do not interact regularly with the employee, they will "have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee. Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id.* We recently emphasized that the decisionmaker's reliance on a subordinate's biased recommendation must be an "uncritical" reliance, with no independent verification of the asserted reason for the proposed employment action. *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1294 (10th Cir. 2013).

The definition of "supervisor" handed down in *Vance* relies on another Title VII term of art: "tangible employment action." Whoever can take or substantially influence tangible employment actions is a "supervisor." *Vance*, 133 S. Ct. at 2448, 2452. While economic injury is almost always sufficient to create a tangible employment action, it is not always necessary. *Ellerth*, 524 U.S. at 762 ("A tangible employment action *in most cases* inflicts direct economic harm." (emphasis added)). For that reason, a tangible employment action can

-19-

include not just the obvious firing or demoting, but also giving an employee "a less distinguished title [or actions resulting in] a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 761 (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)) (internal quotation marks omitted). However, neither "a bruised ego" nor a demotion *without* a concurring change in pay, benefits, duties, or prestige is enough. *Id.* (internal quotation marks omitted).

In addition, a tangible employment action requires some sort of "official act of the enterprise, a company act." *Id.* at 762. "Often, the supervisor will use the company's internal processes and thereby obtain the imprimatur of the enterprise. Ordinarily, the tangible employment decision is documented in official company records, and may be subject to review by higher level supervisors." *Pa. State Police v. Suders*, 542 U.S. 129, 144-45 (2004) (internal quotation marks, brackets, and citations omitted).

One common sense test that can illuminate whether a given harm is a tangible employment action is to ask whether a co-worker could have inflicted the same harm as easily. If the answer is yes, then the harm is not a tangible employment action. *See Ellerth*, 524 U.S. at 762 (explaining that "[a] co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her

offensive conduct . . . ," but a co-worker can only cause his victim to be fired or demoted by means of an "elaborate scheme . . ."); *see also Rubidoux*, 173 F.3d at 1296 (tangible employment actions are things "an harassing co-worker cannot do").

In sum, if Sergeant Benson had or appeared to have the power to take or substantially influence tangible employment actions and used the threat of taking such actions to subject Ms. Kramer to a hostile work environment, then the County is vicariously liable for his severe or pervasive sexual harassment, subject to the *Faragher*/*Ellerth* affirmative defense. *See Vance*, 133 S. Ct. at 2448. Viewing the record evidence in the light most favorable to Ms. Kramer, we have determined there are fact questions as to whether Sergeant Benson had the power to recommend and influence tangible employment actions against Ms. Kramer, and whether under apparent authority principles Ms. Kramer was reasonable in believing Sergeant Benson had such powers even if he in fact did not. In the following subsections, we do not consider whether Sergeant Benson actually took such actions but only whether he may have had the power to do so.

1. ***As Ms. Kramer's direct supervisor, Sergeant Benson completed her performance evaluations and made recommendations regarding her employment status.***

It is undisputed that Sergeant Benson was Ms. Kramer's direct manager, that he was the sole person responsible for writing her performance evaluations,

and that those evaluations could cause her to be promoted, demoted, or fired.[5]

Moreover, the County characterized Sergeant Benson as Ms. Kramer's supervisor.[6] It is further undisputed that while the Sheriff was officially the only person who could fire employees, Sergeant Benson could recommend to the Sheriff that any of his supervisees be fired. Sergeant Benson's responsibility to "document noteworthy . . . behaviors of employees" was explicitly defined by the County as potentially affecting his subordinates' "job advancement, rewards, discipline and discharge."[7] Aple. Supp. App. at 229. Sergeant Benson could also create a "corrective action" plan for a supervisee such as Ms. Kramer, if he determined her performance was "substandard," which might include "reassignment[,] . . . transfer, . . . or separation." *Id.* at 122-23. We accept *arguendo* the County's argument that the Sheriff, not Sergeant Benson, was the

---

[5] "Q: Who was in charge of Camille Kramer's evaluation? A: It would have been Rick Benson." Aple. App. at 163 (Van Wagoner Dep.); Aplt. App. at 176 (performance evaluation of Kramer signed by Benson).

[6] The Sheriff's Office Policies and Procedures Manual stated that the position of sergeant is "generally supervisory." Aplt. App. at 83. When asked whether Sergeant Benson was considered a supervisor, Undersheriff Todd Bonner replied "[y]es." *Id.* at 160. When asked who Sergeant Benson supervised, Undersheriff Bonner replied: "Camille." *Id.*

[7] The Wasatch County Personnel Policy stated that "[i]t is the responsibility of elected officials, department heads *and immediate supervisors* to properly, and in a timely manner, document noteworthy or critical incident behaviors of employees. Such records may be used to support decisions which affect employee status related to job advancement, rewards, discipline and discharge." Aple. Supp. App. at 229 (emphasis added).

"department head," but it is undisputed that Sergeant Benson was considered a "supervisor" in the rank hierarchy.[8] These designations are relevant because while the County policy manual refers to some forms of discipline as being done by the "department head," *see, e.g.*, Aple. Supp. App. at 122 ("Suspension: The department head/elected official may suspend . . . ."),[9] department heads or "supervisors" are referred to with regard to other types of discipline, *see, e.g.*, *id.* ("Corrective Action: . . . 1. The department head/elected official/*supervisor* shall discuss the substandard performance with the employee in an attempt to discover the reasons for such performance and to plan an appropriate solution." (emphasis added)). In the latter category, the listed "[a]ppropriate corrective actions" include "closer supervision, training, referral for personal counseling, *reassignment or transfer*, use of appropriate level career counseling, *or separation*." *Id.* (emphasis added). The manual also says that "[d]uring the implementation of corrective action, the department head/elected

---

[8] See Aple. Supp. App. at 15, referring to sergeants: "[t]his position is generally supervisory."

[9] In her deposition, Ms. Kramer argued with defense counsel as to whether "department head" meant Sheriff or Sergeant Benson. Aple. Supp. App. at 13 (Q: Who was the department head? A: "The department head was Rick Benson. He was in charge of our department. That's how I would read that . . . . Q: You don't believe that department head refers to the sheriff's department, so that would be the sheriff? A: No.") Even if the County is correct that "department head" referred to the Sheriff, whether Ms. Kramer was reasonable in thinking "department head" referred to Sergeant Benson in the context of bailiffs – or whether the term and the policy are ambiguous–are questions properly considered under our apparent authority analysis, *infra*.

official/*supervisor* shall frequently evaluate and document the employee's progress." *Id.* at 122-23. This entry reinforces the likelihood that Sergeant Benson had the power to influence or recommend tangible employment actions – he could "plan an appropriate solution" including "reassignment or transfer" or "separation," and he could likely influence other tangible employment actions by means of "frequent[] evaluat[ion] and document[ation]" of an employee's compliance with a corrective plan – all this after having first decided that an employee's performance was "substandard." *Id.*

In addition, the Sheriff's Department's own policy manual included a section called "Disciplinary Measures." *Id.* at 14. One type of disciplinary measure referred to is "Relief of Duty," which occurs "in cases *where a supervisor finds it necessary . . . .*" *Id.* at 14-15 (emphasis added). That section indicates that the Sheriff would determine whether relief of duty was with or without pay, but apparently the "supervisor" could decide in the first instance whether one of his subordinates would be relieved from duty.

In addition, bailiffs worked at the justice court instead of the Sheriff's office and the record is unclear as to when, if ever, the Sheriff personally worked with Ms. Kramer or directly supervised her work as a bailiff. Where an harasser is empowered to effect significant changes in employment status indirectly through recommendations, performance evaluations, and the like, and where the person with final decision-making power does not work directly with the plaintiff,

the harasser may be a "supervisor" under Title VII.  *See Vance*, 133 S. Ct. at 2452; *see also Ellerth,* 524 U.S. at 762 (approvingly citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), in which "supervisor did not fire plaintiff; rather, the Career Path Committee did, but the employer was still liable because the committee functioned as the supervisor's 'cat's-paw'").  In contrast to a co-worker who can only cause a demotion or a pay cut through "some elaborate scheme," *Ellerth*, 524 U.S. at 762, a supervisor who lacks the direct power to impose tangible employment consequences can accomplish the same easily, without scheming, if the employer has "effectively delegated" the power to make those decisions to him by empowering him to evaluate his supervisees and then relying on his recommendations.  *Vance*, 133 S. Ct. at 2452; *see also id.* at 2434 n.8 (explaining that the harasser in *Faragher* would be considered a supervisor because his recommendations were highly influential); *see also Lobato*, 733 F.3d at 1294-95 (employer is liable if the employer relied on facts from biased subordinate in deciding to take tangible employment action).

On the record before us, Ms. Kramer has raised a genuine issue of fact as to whether the Wasatch County Sheriff's Department effectively delegated to Sergeant Benson the power to cause tangible employment actions regarding Ms. Kramer by providing for reliance on recommendations from sergeants such as Benson when making decisions regarding firing, promotion, demotion, and reassignment.  *Vance*, 133 S. Ct. at 2452.  Ms. Kramer is not required to establish

-25-

that the Sheriff would follow Sergeant Benson's recommendations blindly.  Even if the Sheriff undertook *some* independent analysis when considering employment decisions recommended by Sergeant Benson, Sergeant Benson would qualify as a supervisor so long as his recommendations were among the proximate causes of the Sheriff's decision-making.  *See Lobato*, 733 F.3d at 1294-95; *Staub*, 131 S. Ct. at 1193.

### 2.  *Apparent authority principles*

Even if it is determined that Sergeant Benson lacked the actual supervisory authority described above, he could still qualify as a supervisor under apparent authority principles.  "In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence." *Ellerth*, 524 U.S. at 759.  But "in the unusual case," apparent authority can suffice to make the harasser a supervisor for Title VII purposes, so long as the "the victim's mistaken conclusion [is] a reasonable one." *Id.*  The district court held that no apparent authority existed because Ms. Kramer was unreasonable as a matter of law in believing that Sergeant Benson had the power to fire her.  As we have explained, however, firing is not the only kind of tangible employment action that can make one a supervisor.

Apparent authority exists where an entity "has created such an appearance of things that it causes a third party reasonably and prudently to believe that a second party has the power to act on behalf of the first [party]." *Bridgeport*

*Firemen's Sick & Death Ben. Ass'n v. Deseret Fed. Sav. & Loan Ass'n*, 735 F.2d 383, 388 (10th Cir. 1984). We have recognized that "the question of apparent authority is usually considered a question of fact." *Id.*

One relevant fact question is how much power the principal has actually given to the agent. RESTATEMENT (THIRD) OF AGENCY § 3.03, cmt. c (2006). Thus, where the principal (Wasatch County) has given the agent (Sergeant Benson) some amount of power, it might be reasonable for the third party (Ms. Kramer) to believe that the agent has other types of related powers even if the agent actually does not. *Id.*

Comparing Sergeant Benson with the harassers in *Parkins*, 163 F.3d at 1034-35, illustrates this principle. The plaintiff in *Parkins* was a dump-truck driver whose job was to haul materials and debris to and from construction sites. *Id.* at 1031. Her harassers were two foremen who were sometimes present at some of the sites. *Id.* at 1032-33. The plaintiff "did not work exclusively at the same sites at which [the harassers] worked. Rather, she worked with approximately ten foremen at various sites." *Id.* at 1034. Nor did she work side-by-side with the harassers because she was usually driving a truck. *Id.* The powers wielded by the harassers, "[a]t most, [consisted of] . . . tell[ing] [plaintiff] where to dump or pick up a load." *Id.* The harassers' "authority was so limited that they did not assign employees to particular sites and could not require Parkins' presence on a job site." *Id.* They certainly did not have the power to

-27-

evaluate the plaintiff.  Nor did the employer in *Parkins* consider the harassers to be the plaintiff's supervisors in any sense.[10]  Because the harassers enjoyed no "more than minimal authority, and exercised almost no control over truck drivers [such as the plaintiff]," the Seventh Circuit held that no reasonable person would have believed they had sufficient authority to qualify as supervisors and thus no apparent authority existed.  *Id.* at 1035.

Every relevant fact missing in *Parkins* is present here.  The Sheriff considered Sergeant Benson to be Ms. Kramer's supervisor.  The Sergeant worked at the same site with Ms. Kramer every day, where he was Ms. Kramer's only immediate manager.  The County assigned to Sergeant Benson the tasks of telling Ms. Kramer what to do every day, evaluating her performance, and reporting on her performance to higher management.  Because of the authority given to him by the County, Sergeant Benson could assign Ms. Kramer to distinctly different tasks in different locations: he could assign her to the magnetometer, give her road training, assign her to courtrooms, or order her to transfer prisoners.  Sergeant Benson could also decide what days she worked and whether and when she got vacation or sick leave.  The harassers in *Parkins* had no input into the plaintiff's

---

[10] *Compare Parkins*, 163 F.3d at 1034-35 ("Civil Constructors President and EEO Officer Bruce Helm also testified about the limited authority of foremen: Q. Is the foreman ever considered the immediate supervisor? A. No."), *with* Aplt. App. at 160 (Deposition of Undersheriff Todd Bonner: "Q: Was [Sergeant Benson] considered a supervisor? A: Yes. Who did he supervise? A: Camille [Kramer].").

performance evaluations, assignments, or leave days and, unlike Sergeant Benson, were not specifically assigned to evaluate and make recommendations about the plaintiff. Under the circumstances here, given the County's and the Sheriff's manuals, there is a genuine issue of fact as to whether Ms. Kramer was reasonable in believing that Sergeant Benson had additional powers – such as the power to transfer, discipline, demote, or fire her. *Cf. id.*

A jury is especially likely to conclude such beliefs were reasonable because Sergeant Benson repeatedly told Ms. Kramer he did in fact possess such powers:

> Q: Could he have fired you? A: Yes. Q: What makes you think he could have fired you? *A: He told me. He reminded me of that on a daily basis.* Q: Are you aware that in the sheriff's policies and procedures manual that the only person that could do the terminations is the sheriff? A: I'm not aware of that. Q: What about promotions? Could he give you a promotion? A: Yes. Q: What about a demotion, do you feel he could give you a demotion? A: Yes. Q: You're not aware of the policies and procedures manual, I take it, that only the sheriff can have control over that? A: I'm not aware of that, no.

Aplt. App. at 62-63 (emphasis added) (Kramer Dep.).

For all of these reasons, whether Sergeant Benson qualifies as a "supervisor" under apparent authority principles is a fact issue that precludes summary judgment on Sergeant Benson's "supervisor" status.

## B. Tangible employment actions

If Sergeant Benson was a supervisor within the meaning of *Vance*, Wasatch County would be strictly liable for his harassment of Ms. Kramer if it culminated in a tangible employment action. *Ellerth*, 524 U.S. at 761-62. Ms. Kramer argues

-29-

that the following constitute tangible employment actions: (1) the rape; (2) the bad performance evaluation that was never submitted; (3) Sergeant Benson denying her vacation days; and (4) Sergeant Benson refusing to give her road training and assigning her to the magnetometer full-time. None of these amount to a tangible employment action on the facts here.

### 1. The rape

While rape is inarguably a severe form of sexual harassment, on the facts here it is not a "tangible employment action" in the sense meant by *Ellerth*, 524 U.S. at 761, and *Vance*, 133 S. Ct. at 2447 n.9. In support of her argument that rape constitutes a tangible employment action, Ms. Kramer cites to cases such as *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243-44 (10th Cir. 2001), and *Little v. Windermere Relocation, Inc.*, 301 F.3d 958 (9th Cir. 2002), which held that sexual assault such as rape changes the "terms and conditions" of one's employment and is thus actionable sex discrimination under Title VII. *See Little*, 301 F.3d at 967. This argument conflates the concept of "tangible employment action" with the broader Title VII concept of "altered . . . term[s] [or] condition[s]" of employment. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007). While all Title VII violations, including sexual assault, alter the "terms, conditions or privileges" of employment, 42 U.S.C. § 2000e-2(a)(1), the universe of sexual harassment Title VII claims consists of two realms: one in which the terms and conditions of employment are altered by a "hostile work

-30-

environment," *see, e.g.*, *Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012), and another in which the terms and conditions are altered by a "tangible employment action." *Ellerth*, 524 U.S. at 753-54. Thus, Ms. Kramer's argument that rape changes the terms or conditions of employment proves nothing about whether the cause of the change was a "hostile work environment" or a "tangible employment action," which is the critical question with respect to the *Faragher*/*Ellerth* defense.

In *Suders*, the Court considered *Reed v. MBNA Marketing Systems, Inc.*, 333 F.3d 27 (1st Cir. 2003), a case in which a supervisor sexually assaulted his subordinate after coercing her to come to his house. The First Circuit held in *Reed* that the situation presented a hostile workplace, not a tangible employment action, and the Court in *Suders* essentially agreed. The Court explained that the harasser's sexual assault "did not preclude the employer from asserting the *Ellerth*/*Faragher* affirmative defense, . . . [because] the supervisor's behavior involved no official actions." *Suders*, 542 U.S. at 150.

Ms. Kramer provides no reason why the same logic would not apply here. Unlike a tangible employment action, the rape did not involve the "presence . . . of an official act" of the employer. *Id.* Without some kind of relationship between the rape and an official company action, Sergeant Benson's conduct was "exceedingly unofficial and involved no direct exercise of company authority," and is therefore "exactly the kind of wholly unauthorized conduct for which the

affirmative defense was designed." *Id.* (quoting *Reed*, 333 F.3d at 33) (internal quotation marks omitted).

### 2. *The bad performance evaluation*

The unflattering performance evaluation that Sergeant Benson prepared was not a tangible employment action because he revised it to a better evaluation before submitting it. This kind of behavior may have contributed to the hostile work environment, and it may be relevant to Ms. Kramer's reasonableness in not reporting Sergeant Benson. But where threats are made but unfulfilled, the claim "should be categorized as a hostile work environment claim" not a tangible employment action claim. *Ellerth*, 524 U.S. at 754.

### 3. *The denial of leave time*

Ms. Kramer also contends that Sergeant Benson's denial of her previously-approved leave time should be considered a tangible employment action. The record contains evidence of three occasions on which such conduct took place. On the second and third occasions, Sergeant Benson himself failed to relieve Ms. Kramer as he had promised to do. If he had used his formal control over her schedule to officially deny her the leave, it would more likely have been "documented in official company records," or "subject to review by higher level supervisors." *Ellerth*, 524 U.S. at 762. Failing to relieve Ms. Kramer per an informal, oral agreement is the same kind of injury that a co-worker could have inflicted. Accordingly, the second two denials of leave cannot rise to the level of

-32-

tangible employment actions.  *See id.*; *see also Vance*, 133 S. Ct. at 2448.  While the first incident was more formal because Sergeant Benson retracted an officially-approved leave, there is no evidence to support an inference that the loss of one day's leave time constituted a "significant" change in Ms. Kramer's benefits, eligibility for promotion, or employment status.  *See Ellerth*, 542 U.S. at 762.  On the record here, none of the denials of leave constituted a tangible employment action.

### 4.  *Assigning Ms. Kramer to the magnetometer and denying her road training*

Finally, Ms. Kramer posits that Sergeant Benson's denying her road experience and placing her on the magnetometer all day (which precluded road training) constituted a tangible employment action because, she claims, road experience was "necessary for promotion." Aplt. Br. at 27.  The County argues that being placed on the magnetometer cannot be a tangible employment action because "requiring [plaintiff] to perform an essential function of her job cannot be a reassignment with significantly different responsibilities." Aple. Br. at 29.  But *Vance* explained that requiring an employee to perform full time what may be a peripheral part of her job description, if it reduced the possibilities for advancement or otherwise had economic consequences, "might constitute a tangible employment action." *Vance*, 133 S. Ct. at 2447 n.9; *see also* EEOC, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by*

*Supervisors* No. 915.002(IV)(B) (1999) (citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999)). Being placed on the magnetometer full time could not be a tangible employment action merely because it was unpleasant, however. *See Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).

We consider together Ms. Kramer's contentions regarding Sergeant Benson's unfair magnetometer assignment and his failure to train her on the road because each could only be a tangible employment action if it had deleterious economic consequences or reduced her opportunities for advancement. *Ellerth*, 524 U.S. at 761-62; *Vance*, 133 S. Ct. at 2447 n.9. Unfortunately for Ms. Kramer, there is simply no evidence in the record to support that theory. Her brief asserts that road training was necessary for promotions. Yet in her deposition, Ms. Kramer stated that she was offered a "road officer" position before she even began working as a bailiff, but did not take it because she did not live in Wasatch County at the time, which was required. She also testified that promotions occurred on the basis of "the order you were hired." Aple. App. at 4. No testimony or evidence supports Ms. Kramer's claim that road training was necessary or even helpful for a promotion.

To survive summary judgment, Ms. Kramer cannot rest upon the allegations in her brief but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (internal

-34-

quotation marks omitted).  "[S]he easily could have avoided [this problem] simply by testifying, if she was able to do so," that road training was in fact somehow related to promotions.  *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087-88 (10th Cir. 2007).   Without such evidence, there is no genuine issue for trial.  *Anderson*, 477 U.S. at 248.

For the foregoing reasons, we affirm the district court's conclusion that no tangible employment action occurred.

## C.  The *Faragher/Ellerth* defense

Even absent a tangible employment action, if Sergeant Benson qualifies as a "supervisor" the County is vicariously liable for his severe or pervasive sexual harassment unless it can establish the affirmative defense announced in *Faragher*, 524 U.S. at 807, and *Ellerth*, 524 U.S. at 765.  This defense has "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Pinkerton v. Colo. Dep't of Trans.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (internal citation omitted).

The defendant bears the burden to prove both prongs of the defense by a preponderance of the evidence.  *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000) (citing *Faragher*, 524 U.S. at 807-08).  Thus, the employer

"must prove both that it *acted* reasonably in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities. The employer will lose this defense if it fails either prong." *Clark v. United Parcel Servs.*, 400 F.3d 341, 349 (6th Cir. 2005).

To win summary judgment on the *Faragher/Ellerth* defense, an employer must "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 947 (10th Cir. 1990) (internal quotation marks and citation omitted). "The defendant must demonstrate that no disputed material fact exists regarding the affirmative defense asserted" when the evidence is viewed in the light most favorable to the plaintiff. *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011) (internal quotation marks, omission, and alteration omitted).[11] Even on undisputed facts, however, "the judgment call as to reasonableness is itself a jury issue unless no reasonable jury could decide it in the plaintiff's favor." *Reed*, 333 F.3d at 34. Wasatch County has not supported its summary judgment motion with evidence that entitles it to judgment as a matter of law under either of the affirmative defense's two prongs.

---

[11] Only after the defendant makes such a showing does the burden shift back to the plaintiff, who must then "produce evidentiary materials that demonstrate the existence of a 'genuine fact' for trial." *Anderson*, 907 F.2d at 947 (internal quotation marks and citation omitted).

### 1. *Prong One: Wasatch County's evidence does not establish as a matter of law that the County took reasonable means to prevent and promptly correct sexual harassment.*

The first prong of the affirmative defense requires the employer to establish that it took reasonable care to both "prevent and correct promptly" sexual harassment. *Helm*, 656 F.3d at 1288. The County had a policy prohibiting sexual harassment and Ms. Kramer was aware of it. Rather than arguing that the policy was a substantively deficient form of prevention, Ms. Kramer's appeal centers on whether the County took reasonable care to "promptly correct" sexual harassment.

With respect to this prong, the district court concluded:

> [T]he Sheriff exercised reasonable care to promptly correct any sexual harassment of which he became aware. The record shows that whenever the Sheriff was actually informed about such type of behavior, he took immediate action.
> . . . Ms. Kramer points to the Sheriff's re-enactment of harassment during the 2006 staff meeting as an example of unreasonable action that simply perpetuated the hostile work environment. Although that meeting was inartfully conducted by Sheriff Van Wagoner, it nevertheless was an attempt to promptly remediate the reported sexual harassment. It does not establish that the County failed to exercise reasonable care to remedy sexual harassment in the workplace.

*Kramer*, 857 F. Supp. 2d at 1208-09. In requiring Ms. Kramer to "establish" that the County failed to exercise reasonable care, the district court applied the wrong standard.

Requiring the plaintiff to establish the employer's unreasonableness is the standard for analyzing Wasatch County's liability under a *negligence* theory.

-37-

*Adler*, 144 F.3d at 677. But the *Faragher/Ellerth* framework functions by obviating the need for the plaintiff to plead or prove negligence where the harasser is a supervisor. *Ellerth*, 524 U.S. at 747 (question presented, and answered in the affirmative, is whether an employee "can recover against the employer *without showing the employer is negligent or otherwise at fault* for the supervisor's actions" (emphasis added)). Because the burden to prove the defense is the employer's, summary judgment on the affirmative defense cannot be entered on the basis of anything the plaintiff failed to do until the defendant has supported its motion with evidence "that would entitle it to a directed verdict if not controverted at trial." *Anderson*, 907 F.2d at 947 (internal quotation marks omitted). Wasatch County's evidence that it took reasonable measures to promptly correct sexual harassment falls short of this standard.

The County's evidence that the Sheriff responded to sexual harassment "of which he became aware," *Kramer*, 857 F. Supp. 2d at 1208-09, does not automatically entitle the County to judgment as a matter of law. Not just any response to sexual harassment establishes reasonable efforts to comply with Title VII. Employer responses must also meet minimal standards of quality that reflect the preventive purpose of Title VII and the *Faragher/Ellerth* defense. A showing that an employer made "an attempt to promptly remediate the reported sexual harassment," *id.* at 1208, without any showing that such attempts were "reasonably calculated to end the harassment" and deter future harassers, does not

-38-

entitle the County to judgment as a matter of law.  *See Adler*, 144 F.3d at 676.

The County did not provide any evidence that the Sheriff Department's interventions were reasonably calculated to end the harassment, deter future harassers, or protect Ms. Kramer.  The parties hotly dispute what happened at the meeting called by the Sheriff in response to Ms. Kramer's initial complaint about harassment in the jail, and Ms. Kramer testified that the harassment did not stop after that meeting.  While her perceptions regarding that meeting are relevant to her own reasonableness under *Faragher*'s second prong, as we discuss *infra*, we need not decide what that meeting does or does not say about the County's efforts to comply with Title VII because the undisputed facts about the County's response to Ms. Kramer's subsequent allegations against Sergeant Benson are enough to preclude judgment as a matter of law for the County on *Faragher*'s first prong.

When the Sheriff first learned of the allegations, he initiated an investigation into what he referred to as "some sex" or "sexual misconduct" between Ms. Kramer and Sergeant Benson which, he explained, is "a violation of our policy and procedure, . . . especially if it's on-duty."  Aple. Supp. App. at 166.  It is unclear if he perceived the putative policy violation as sexual harassment or simply as a prohibited intra-office relationship between a

-39-

supervisor and his subordinate.[12]  *See id.* at 171 (the Sheriff explained that because Sergeant Benson was Ms. Kramer's "supervisor . . . POST does not condone that kind of relationship").  The Sheriff did not consult the County's human resources professional about the allegations or ask him for advice as to what to do.[13]  Instead, the Sheriff assigned the investigation to Detective Brian Gardner, not because Detective Gardner had any specific qualifications for this task but because he "was the unfortunate guy that was on-duty on that particular day."  *Id.* at 167.

Moreover, Detective Gardner had been friends with Sergeant Benson for over ten years and considered him a mentor.  In addition, the fact that Detective Gardner was never trained to investigate a complaint of sexual harassment is relevant to whether the County's efforts were deficient.  *See Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1239 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Nor did the Sheriff give Detective Gardner any "policy or procedures on how to conduct the investigation."  Aple. Supp. App. at 171.  The Sheriff

---

[12] The Sheriff's testimony suggests his view was that sex with "no consent" by a supervisor might only violate Department policy if it occurred while the employees were on the clock, and that sex while on the clock was his real concern.  The Sheriff explained: "consent" or "no consent," "the fact that . . . some of these happened on lunch hours that I am paying for on my time. That's a direct violation . . . ."  Aple. Supp. App. at 173.

[13] The Sheriff explained that he did not use a human resources employee to investigate because the human resources department "consists of one person. We have never used him for any of our investigations." Aple. Supp. App. at 168.

explained that he gave Detective Gardner no such instructions because "[w]e don't have any real hard-set investigative standards policy . . . other than what the state has and the federal government has put out, as far as sexual harassment." *Id.* at 172. That statement is contrary to the evidence the County argues proves its reasonable efforts to prevent harassment: the Wasatch County Personnel Policy, which does in fact contain an "Investigation Procedure" for sexual harassment. *Id.* at 250. The investigative procedure provides that the investigator should "obtain[] a written statement from complainant . . . [,] discuss[] the matter with the alleged offender . . . [,] [and] obtain[] statements from possible witness(es) from both sides of the issue. Upon completion, an investigation report shall be submitted to the personnel officer or Board of County Commissioners as appropriate." *Id.* Perhaps unsurprisingly, given the Sheriff's ignorance of the County's policy, Detective Gardner's "investigation" did not follow these steps. He did not obtain a written statement from Ms. Kramer, nor did he submit a report to the personnel officer or to anyone other than the Sheriff. The record does not contain any evidence that he "obtained statements from possible witnesses from both sides of the issue."

Instead of seeking to discover whether Title VII had been violated – in other words, whether Ms. Kramer had been sexually harassed in a way that affected her ability to do her job – which he admits he did not do, Detective Gardner focused on finding out who was the father of Ms. Kramer's baby and

then on uncovering the extent of Ms. Kramer's consensual affair with that man.

Ms. Kramer testified that Detective Gardner repeatedly told her no one would

believe her allegations about Sergeant Benson unless she confessed to having a

consensual affair with her baby's father. Upon learning that Ms. Kramer's

paramour was a County firefighter, Detective Gardner reported this information to

the Sheriff. Detective Gardner then returned to Ms. Kramer's house for a second

interview, during which he repeatedly suggested that, due to her relationship with

a firefighter, she should resign.[14]

The Sheriff told POST about Ms. Kramer's affair with the firefighter, and

POST suspended Ms. Kramer's certification. The Sheriff admitted he told

Detective Gardner that he wanted Ms. Kramer to resign in order to protect the

reputation of the fireman and of the Sheriff's Department. Ms. Kramer never

returned to work for the County. In her view, the County's response just

---

[14] Transcript of interview: Gardner: ". . . a resignation is going to look better for you as far as getting another job, as far as looking good on a resume. Um, and as far as keeping your POST certification. No, I'm not going to tell you which way to go. I know um, just from me to you, a resignation would look a lot better. . . . Well, do you want to give me a resignation, today? . . . I'm not trying to persuade you either way, . . . but I know your hands hurt and you can't write[,] but I would write a resignation right up for you today if you would like me to. Do you want to do that?" Aple. Supp. App. at 361-62. We note also that Ms. Kramer was on narcotic pain relievers and tranquilizers at the time of this interaction, having just been in a car crash. Gardner: "What kind of medications are you on today?" Kramer: "Um, Valium and Lortab and I think one else, but I don't remember." *Id.* at 366.

confirmed her suspicion that complaining was a bad idea.[15]  Responses to

complaints that encourage the plaintiff to drop the complaint or otherwise

penalize the plaintiff certainly do not prove an employer's reasonableness as a

matter of law.  *See Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1209 (10th Cir.

2000); EEOC Compl. Man. (CCH) § 615.4(a)(9)(iii), 3103, 3213 (1988)

("appropriate corrective action . . . fully remedie[s] the conduct without adversely

affecting the terms or conditions of the charging party's employment in some

manner . . . .").

More specifically, investigations targeting the victim for unrelated

misconduct are especially contraindicative of reasonably calculated efforts to

promptly correct sexual harassment.[16]  *See McInnis v. Fairfield Communities,*

*Inc.*, 458 F.3d 1129, 1135 (10th Cir. 2006) (finding employer unreasonable when

in response to plaintiff's complaints, employer focused on plaintiff's past

misconduct); *see also Williams*, 497 F.3d at 1090 n.7 ("[T]he 'prospect' of an

investigation [into the plaintiff] . . . could dissuade a reasonable employee from

---

[15] After Detective Gardner's investigation began, Ms. Kramer said: "that's when I determined that I was in trouble and that nobody had an interest in the rape and I wasn't believed and I needed to get myself an attorney." Aplt. App. at 132.

[16] Ms. Kramer's consensual sex life with another person, County employee or not, was unrelated to her allegations regarding Sergeant Benson. "A person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment." *Windsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 (10th Cir. 1996) (internal quotation marks, alteration, and citation omitted).

making or supporting a charge of discrimination." (internal citation omitted)).

Using a sexual harassment complaint as an opportunity to investigate the complainant herself for unrelated misconduct does not communicate to other employees that complaining about sexual harassment can be done "without undue risk or expense." *Faragher*, 524 U.S. at 806.

Not only did the investigation here fail to demonstrate that the County employed reasonable means to discharge its Title VII obligations, the Sheriff's response to Ms. Kramer's allegations suggests that he did not understand he had a Title VII compliance matter on his hands. Under Title VII, "[e]mployers have a duty to express strong disapproval of sexual harassment, and to develop appropriate sanctions." *Adler*, 144 F.3d at 684 (Briscoe, J., concurring in part and dissenting in part) (citing 29 C.F.R. § 1604.11(f)). In response to learning that Sergeant Benson was not the father of Ms. Kramer's baby and that "it was possibly a rape," the Sheriff decided instead that the Department need not continue to investigate. He reported Ms. Kramer to POST for having relations with the County firefighter and he asked Todd Hull, the person investigating Ms. Kramer for the missing money, to "please handle" the rape investigation. Aple. Supp. App. 166-67. The Sheriff said: "basically my end of [the investigation] was completed within a couple of days." *Id.* at 167.

The evidence shows that Todd Hull handled the investigation as a purely criminal matter. There is no evidence the Department sought to improve its

sexual harassment prevention program or otherwise reduce the "risk of future harassment." *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1529 (9th Cir. 1995). "An employer's failure to fully investigate a complaint supports a finding that its response was inadequate . . . . Moreover, an employer's decision to do nothing on the basis of an inadequate investigation likewise supports a finding that the employer did not take prompt and effective remedial action." *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 543 n.7 (10th Cir. 1998). Sergeant Benson did ultimately resign, but that alone is not sufficient to avoid vicarious liability. *Harrison*, 248 F.3d at 1026 (the fact that the harassment ends is not "sufficient by itself to avoid vicarious liability under Title VII for sexual harassment committed by a supervisory employee").

On this record, there remains a genuine issue of fact as to whether the County's response to Ms. Kramer's sexual harassment complaint fell short of demonstrating that the County took reasonable efforts to discharge its duty under Title VII, as required to establish the affirmative defense. *Faragher*, 524 U.S. at 806.

### 2. *Prong Two: Wasatch County's evidence does not compel the conclusion that Ms. Kramer was unreasonable.*

The second prong of the affirmative defense requires the employer to "prove that the plaintiff unreasonably failed to avoid or reduce harm." *Suders*, 542 U.S. at 146. The County contended it was entitled to summary judgment on

this prong because Ms. Kramer did not "take advantage of preventive or corrective opportunities provided by [Defendants]" in a timely manner.  Aple. Br. at 8.  It argued that Ms. Kramer's excuse for failing to timely complain to the Sheriff – that she was scared Sergeant Benson would retaliate – was "not sufficient to explain a delay in reporting," *id.* at 34, and that Ms. Kramer voluntarily put herself in situations in which she should have known she would be sexually harassed by Sergeant Benson.  The district court agreed.  Once again, our review of the record convinces us that fact questions remain on this issue.

> a. Ms. Kramer's failure to lodge a formal complaint does not itself demonstrate unreasonableness as a matter of law.

The County emphasizes that "Sheriff Van Wagoner never received a complaint from the plaintiff with regard to Benson's actions." Aple. Br. at 32 n.10.  The district court agreed that this was inexcusable because Ms. Kramer "had followed" the procedures for reporting harassment "in the past."  *Kramer*, 857 F. Supp. 2d at 1209.  But the fact that Ms. Kramer had used County grievance procedures in the past to report other things done by co-workers does not by itself establish she was unreasonable as a matter of law in failing to use them to report severe sexual abuse at the hands of her supervisor.  Her failure to complain formally to the Sheriff is simply not dispositive of the affirmative defense's second prong.  *Faragher*, 524 U.S. at 782 (plaintiff never complained, but employer not relieved of liability); *Ellerth*, 524 U.S. at 748 (same); *see also*

*Meritor*, 477 U.S. at 73 (same); *Reed*, 333 F.3d at 36 ("the Supreme Court's premise" is that "sometimes inaction is reasonable"). In *Faragher* itself, the Court held that the defendant's efforts to prevent sexual harassment were so deficient that it could not assert the affirmative defense at all, even though the plaintiff had never complained to any management personnel. 524 U.S. at 808.

The only duty placed upon plaintiffs is to act reasonably. And what is "reasonable" must be analyzed given the totality of the circumstances. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 (2d Cir. 2010). It is not enough for the County to simply show that Ms. Kramer did not complain; it must also show that her failure to do so was unreasonable under the circumstances. *Suders*, 542 U.S. at 152.

### b. Ms. Kramer's fears of retaliation

A failure to use internal grievance procedures can be unreasonable where the record reveals no reason for it other than a "generalized" fear of retaliation. *Pinkerton*, 563 F.3d at 1063. But where the fear of complaining is not "general" or "nebulous" but is based on "concrete reason[s] to apprehend that complaint would be useless or result in affirmative harm to the complainant," whether the plaintiff was reasonable and whether her fears are credible are questions of fact. *Reed*, 333 F.3d at 35-36.

As previously detailed, Ms. Kramer testified that on numerous occasions Sergeant Benson sexually assaulted her and subsequently told her to "be quiet"

-47-

and "not say anything" or it would be "a career ender." *See, e.g.*, Aplt. App. at 105; *id.* at 121 ("[I]f I go down, you go down. I'm not going down alone. . . . You better keep your mouth shut . . . not one word to anyone."). Sergeant Benson also threatened Ms. Kramer with a poor evaluation unless she would "keep [her] mouth shut and not say anything." *Id.* at 112. These are not unlike the facts in *Wilson*, where the harasser "instructed [the plaintiff] not to file a complaint with either [the college] or the police and to keep her mouth shut, threatening [her] with, among other things, *a poor recommendation* to prevent her from getting a job in the future." 164 F.3d at 539 (emphasis added).

Sergeant Benson's threats were arguably made more intimidating by his actions. In addition to the constant harassment at work, he called and texted Ms. Kramer six times after her lie detector test and followed her home from work regularly. During the same time period, he allegedly threatened to break the taillights of court clerk Collette Ryan's car and court clerk Mindy Probst suspected him of having vandalized her car.

The district court characterized Ms. Kramer's fears as unreasonably based upon "speculation and a patchwork of unrelated and exaggerated events." *Kramer*, 857 F. Supp. 2d at 1209. Crediting Ms. Kramer's version of events, as we must, the events are neither a "patchwork" nor "unrelated." They instead demonstrate a persistent theme: Sergeant Benson was an intimidating person with job-related power over Ms. Kramer who would sexually harass her and then

threaten that she would lose her job if she complained.

Ms. Kramer's fear that Sergeant Benson would make good on his threats was not per se unreasonable given that he did in fact take adverse job actions against her at work – denying her leave time, threatening her with a bad performance evaluation, and giving her long shifts on the magnetometer. Even if these actions did not rise to the level of a tangible employment action, "a reasonable employee could well find . . . a combination of threats and actions taken with the design of imposing both economic and psychological harm sufficient to dissuade him or her from making or supporting a charge of discrimination." *Williams*, 497 F.3d at 1090. This evidence raises a genuine issue of fact as to whether Ms. Kramer's fears of Sergeant Benson were credible and reasonable because they were grounded in "concrete reason[s] to apprehend that complaint would . . . result in affirmative harm to the complainant." *Reed*, 333 F.3d at 35-36.

### c. Ms. Kramer's failure to complain for lack of confidence in the County's remediation efforts

Ms. Kramer also contends she reasonably believed that the County would not adequately respond to complaints of sexual harassment. Fear that an employer's sexual harassment remediation program is inadequate, if credible, can rebut an employer's argument that the plaintiff was unreasonable. *Id.* at 36; *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 525-26 (5th Cir. 2001)

(plaintiff's delay in reporting harassment not unreasonable when he had grounds for believing remediation process would be ineffectual due in part to harasser's influence).

Ms. Kramer argues that her failure to complain was reasonable because the workplace culture was one in which women who spoke out about inappropriate conduct were "ostracized" and given undesirable assignments, while men who had engaged in misconduct were promoted or unaffected. *See* Aplt. App. at 70, 101. She testified that women in the Sheriff's department were expected to tolerate sexual conduct and language and were penalized for complaining about it.

Ms. Kramer offered specific evidence that lends credence to her perceptions. She testified that male jail employees used workplace computers to display sexually explicit "Girl of the Day" screensavers and to watch pornography, a fact corroborated by the Sheriff. *See* Aple. Supp. App. at 161. Ms. Kramer testified in her deposition that when a jail co-worker named Shylah Richins decided to complain about the offensive screensaver images, another female coworker, Tammy Thacker, told Ms. Kramer "[w]e're all going to suffer because she can't just handle it." Aplt. App. 70. The County is incorrect that Ms. Thacker's statement to Ms. Kramer is inadmissible hearsay. It is not offered for the truth of what was said – that Ms. Kramer and Ms. Thacker were "going to suffer" – but for the fact that it was said, that Ms. Kramer heard it, and that it contributed to her perception of the workplace culture. Because Ms. Thacker's

-50-

statement was not offered for its truth, it is nonhearsay. *See* FED. R. EVID. 801(c)(2). Ms. Kramer testified that after Shylah Richins complained, the man responsible for the screensaver was promoted to a road officer position while Ms. Richins was (in Ms. Kramer's opinion) given undesirable assignments and ultimately quit. The Sheriff's testimony corroborates Ms. Kramer's chronology of events: he confirmed that the "female employee" who had complained about the offensive screensaver "quit and went to work for Summit County." Aple. Supp. App. at 161.[17]

Ms. Kramer also testified that after she complained about harassment in the jail, the Sheriff held an inadequate and humiliating staff meeting which did not cause the harassment to stop. When she complained that the harassment had not stopped, Sergeant Benson told her "under the direction of the sheriff . . . just to stay out of the jail." *Id.* at 7.[18]

As further evidence of the County's lax approach to discipline, Ms. Kramer describes a judge's banishment of Sergeant Benson from his courtroom. It is undisputed that the judge did so because Sergeant Benson had been glaring intimidatingly at the female court clerks there. The judge characterized the

---

[17] Ms. Kramer offered this sequence of events to support her perception of the Department as inhospitable to complainants, not to prove that the Department was actually inhospitable to complainants.

[18] This sequence of events was corroborated by the Sheriff: "Q: Did you ever tell Camille not to go back to the jail area because of the problems amongst the jail staff? A: I probably did." Aple. Supp. App. at 170.

matter as quite serious, stating in a memo to the Sheriff: "[t]his court considers this a very serious matter and will take what ever actions are deemed necessary to insure that our court clerks are not intimidated or harassed in any way in the future by this officer." Aplt. App. at 158. Sergeant Benson disregarded the judge's order by entering the courtroom in question. The Sheriff's response to Sergeant Benson's behavior was to call him into his office and simply tell him to follow the judge's order, not to impose any additional discipline. Ms. Kramer observed this series of events and interpreted it as more evidence that the Sheriff would not discipline Sergeant Benson for his misconduct if she were to complain about it. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1148-49 (10th Cir. 2008) (finding employer's failure to "discipline" an employee who engaged in misconduct could communicate to other employees that the employer condoned or tolerated the misconduct).

Taken together, this evidence is sufficient to raise a genuine issue of fact as to whether Ms. Kramer was reasonable in believing it would be futile and potentially detrimental to herself to complain.

      d.  Ms. Kramer's "voluntary" acts in going to Sergeant Benson's house do not make her unreasonable as a matter of law.

The district court found Ms. Kramer unreasonable because she "voluntarily went to Sergeant Benson's house more than once, even after the harassment began (including the time after the rape when she went to his house to deliver a Coke to

-52-

him when he asked).  There is no evidence that she was compelled to do so.  She could have avoided some of the encounters."  *Kramer*, 857 F. Supp. 2d at 1209.

It is well settled that "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, *is not a defense to a sexual harassment suit brought under Title VII*.  The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"  *Meritor*, 477 U.S. at 68 (emphasis added).  Moreover, sexual assaults that take place off-site and outside of work hours can still qualify as actionable sex discrimination.  *See Deters v. Equifax Credit Info Servs.*, 202 F.3d 1262, 1267 (10th Cir. 2000).  By assuming that Ms. Kramer reasonably could have avoided going to Sergeant Benson's house without repercussions, the district court impermissibly weighed evidence in favor of defendant and drew inferences against Ms. Kramer.  *See Tademy*, 614 F.3d at 1141.

While it is debatable whether sex-related conduct with one's supervisor is truly "voluntary" or is a symptom of implicit pressure, *see Meritor*, 477 U.S. at 68, here there is evidence that Sergeant Benson explicitly pressured or coerced Ms. Kramer into going to his house on each occasion.  First, as to the "foot rub" incident, Ms. Kramer agreed to go to Sergeant Benson's house only after constantly telling him "no" had zero effect, after she had complained to the Sheriff's secretary (who apparently did not tell the Sheriff), and after Sergeant Benson's harassment took a turn toward the "intimidating and kind of scary."

Aplt. App. at 88-90. She capitulated when he promised that he would stop harassing her if she gave in. She went with Sergeant Benson in his car because she was eager for road training and he was the only person authorized by the County to provide it to her. He used that time to take her to his house, where he sexually assaulted her. He thereafter stopped his car in a tunnel and assaulted her again. On the third occasion, the house-cleaning incident, Ms. Kramer had rejected Sergeant Benson's request to clean several times, specifically to avoid going to his house. After he started another barrage of harassment at work, enlisting others to similarly pressure her, she finally gave in when he offered to pay for her gas, to give his daughter's used clothes to her daughter, and to permit her children to come along. He then trapped her in his room and raped her. Afterward, he continued with a campaign of more intimidation and manipulation. Finally, with regard to the Coke incident, Sergeant Benson called Ms. Kramer at work and ordered her to transport inmates and to "[b]ring me a Coke." *Id.* at 124. He then talked her into coming near him by saying "Kramer, can we just talk about work," *id.* at 125, and assaulted her again.

Accepting Ms. Kramer's version of the facts, a picture emerges in which Sergeant Benson used his job-related power over Ms. Kramer to compel, pressure, or coerce her to do his bidding. While Ms. Kramer technically "could have avoided" some of the encounters, the record does not establish that she could have done so without incurring some form of adverse employment action.

-54-

Where harassment becomes severe – as it did when Sergeant Benson first assaulted Ms. Kramer – it would obviously be preferable for an employee to complain to upper management immediately.  It would also seem logical from an employee's point of view (blessed by 20/20 hindsight) to refuse to go to the harasser's house again after the first instance.  But there is a long continuum separating behavior that is less-than-perfect from behavior that is unreasonable as a matter of law, *see, e.g.*, *Reed*, 333 F.3d at 35; *Gorzynski*, 596 F.3d at 104-05.  Title VII does not require employees who are already "run[ning] a gauntlet of sexual abuse" at work, *Meritor*, 477 U.S. at 68 (internal quotation marks and citation omitted), to figure out how to effectively stop their harasser or forfeit any legal remedy.  *See Gorzynski*, 596 F.3d at 104-05.

Ultimately, whether the sexual conduct was "unwelcome" and whether Ms. Kramer was unreasonable in participating in it "present[] difficult problems of proof and turn[] largely on credibility determinations committed to the trier of fact."  *Meritor*, 477 U.S. at 68; *see also Reed*, 333 F.3d at 35-36 (plaintiff who was coerced by her supervisor to babysit at his house where he sexually assaulted her was not unreasonable as a matter of law).  The evidence here gives rise to inferences that Ms. Kramer's fears were credible and that her behavior may have been reasonable given all the circumstances.  The evidence of Sergeant Benson's specific threats and actions, the power asymmetry between him and Ms. Kramer, the fact that Ms. Kramer was dealing with the trauma of having been sexually

-55-

assaulted by her supervisor, and the County's Title VII compliance efforts (or lack thereof) are relevant to whether Ms. Kramer's behavior was "objectively unreasonable for one in her position." *Reed*, 333 F.3d at 37. Accordingly, we reverse summary judgment for Wasatch County on both prongs of the *Faragher/Ellerth* defense.

**D. The district court correctly held that County liability could not be premised on negligence.**

If Sergeant Benson does not qualify as a supervisor but is only a co-worker, Ms. Kramer faces a greater burden: in order to establish a Title VII violation, she must show that the County had actual or constructive notice of the harassment and negligently failed to remedy or prevent it. *Turnbull*, 255 F.3d at 1244. The record evidence viewed in the light most favorable to Ms. Kramer fails to support an inference that the County had actual or constructive knowledge of Sergeant Benson's sexual harassment before Ms. Kramer's car accident. Accordingly, the County cannot be held liable for Sergeant Benson's harassment on the basis of negligence.

In assessing whether an employer was negligent in dealing with known harassment, "[a]ctual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees." *Adler*, 144 at 673. Although the Sheriff had actual knowledge of Ms. Kramer's jail harassment by co-workers and the money-related harassment by Sergeant Benson, he did not

have actual knowledge of the sexual harassment and sexual assaults by Sergeant Benson that form the core of Ms. Kramer's hostile work environment claim.[19] Ms. Kramer must therefore point to evidence that the County had constructive notice of the risk to which she was exposed.

Ms. Kramer apparently seeks to premise constructive notice on the notion that Sergeant Benson was a "dangerous employee" whose tendencies the County should have known about, an approach to constructive notice we ratified in *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 783-84 (10th Cir. 1995). To support her dangerous employee theory, Ms. Kramer contends the County knew of Sergeant Benson's "history of rule-breaking" before he became her supervisor based on allegations that he had engaged in sexual misconduct with female confidential informants (CIs) when he worked in the narcotics unit,[20] that

_____

[19] A "management-level employee," for the purposes of imputing knowledge of co-worker harassment to the employer, need only be someone who has at least some authority over the plaintiff or at least some control over the working environment. *See Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998). The parties do not dispute that the Sheriff would fit this definition. Ms. Kramer does not argue that anyone other than the Sheriff had knowledge and would qualify as a management-level employee for the purposes of imputing notice to the County.

[20] The evidence regarding Sergeant Benson's alleged sexual conduct with confidential informants comes from a police report written by one of the officers investigating Ms. Kramer's rape allegations. The report states: "On Thursday, July 26, 2007, I met with Lt. Winterton, Brian Gardner . . . the sheriff, the chief deputy . . . they said there was an allegation that Rick may have been sexually active with two CIs when he worked narcotics." Aplt. App. at 166-67. The district court held that this report was inadmissible hearsay. The report would be hearsay if offered to show that Benson had a history of sexual harassment, but it

(continued...)

-57-

he had fixed a ticket for a friend, and that he had taken a County vehicle out of the county. In addition to those incidents, which predate the events in this case, Ms. Kramer points to specific complaints made during the relevant time period: her complaint to the Sheriff that Sergeant Benson was harassing her about the missing money, Judge McCotter's telling the Sheriff that Sergeant Benson was glaring intimidatingly at the female clerks, and the Sheriff's awareness that a female clerk suspected Sergeant Benson of having vandalized her car.

An employer's knowledge that the harasser had harassed people other than the plaintiff could be relevant to whether the employer had constructive notice of the dangerousness of the employee, but the "extent and seriousness of the earlier harassment and the similarity and nearness in time to the later harassment should be factors in deciding whether to allow the evidence of harassment of others to prove notice." *Hirase-Doi*, 61 F.3d at 783-84. Applying these factors here, the instances of Sergeant Benson's misconduct of which the County had actual knowledge did not impute constructive notice to the County of his sexually assaulting Ms. Kramer.

Sexual assault is not the kind of harm that would fall "within the risk"

---

[20](...continued)
is nonhearsay if offered only to show that the Sheriff, or other high-level County personnel, had knowledge that there had been allegations of sexual misconduct against Sergeant Benson in the past. *See Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 408 (1st Cir. 2002) (out-of-court statement not hearsay because not offered to prove actual past harassment, but employer's knowledge of alleged past harassment).

created by an employee known to fix tickets or misuse work vehicles. *See id.* at

784 (quoting RESTATEMENT (SECOND) OF AGENCY § 213, cmt. d (1958)). Sexual

misconduct with CIs comes closer to creating a relevant risk, but there is no

evidence to suggest that this sexual conduct was nonconsensual. Nor does the

record even suggest a time frame regarding when this alleged misconduct

occurred. Temporal proximity is crucial when considering whether knowledge of

past bad acts creates constructive notice of later acts. *Compare id.* at 780, 784

(knowledge that harasser was harassing other women during the same time period

as he was harassing plaintiff created constructive notice), *with Ford v. West*, 222

F.3d 767, 776-77 (10th Cir. 2000) (notice of similar events from more than ten

years prior did not create constructive notice). Because there is no evidence that

the CI misconduct was either similar in nature or close in time to Ms. Kramer's

hostile work environment, it cannot support an inference that the CI affair gave

the County constructive notice of the risk that Sergeant Benson was likely to

sexually harass his subordinates.

Nor would the complaints that were made during the relevant time period

have given the County constructive notice of the risk posed by Sergeant Benson.

Although Sergeant Benson's harassment of Ms. Kramer about stealing money put

the County on notice that he had a proclivity to harass subordinates about stealing

(as the type of harm "within the risk"), it did not give the Sheriff constructive

notice that Sergeant Benson also had a proclivity to sexually harass

subordinates.[21]   The same is true with respect to the Sheriff's knowledge that Sergeant Benson was glaring intimidatingly at female clerks in Judge McCotter's courtroom and that one of the court clerks suspected Sergeant Benson of vandalizing her car.  None of that information concerned the type of sexual misconduct that Ms. Kramer argues created the illegal hostile work environment here.  While these latter examples pass the close-in-time test, they are too substantively dissimilar to have put the employer on notice of the risk to which Ms. Kramer was unfortunately exposed.  *Cf. Tademy*, 614 F.3d at 1147 (employer's knowledge of similar racist conduct against another employee supports constructive notice regarding racial harassment of plaintiff).

Ms. Kramer alternatively seeks to impute constructive knowledge to the County on the theory that sexual harassment in the workplace was so pervasive

---

[21] Ms. Kramer contends her complaint to the Sheriff about Sergeant Benson was general and cites *Lockard*, 162 F.3d at 1074, for the proposition that general complaints can put an employer on notice of the risk of sexual assault.  We disagree.  In *Lockard,* the plaintiff told her manager repeatedly that she felt "uncomfortable" waiting on certain customers and asked him not to assign her to those customers.  The manager was aware that the customers in question had just assaulted Ms. Lockard by pulling her hair.  We held that the manager had constructive notice of the risk that the customers would sexually assault the plaintiff.  *Id.* at 1075.  Here, by contrast, Ms. Kramer's complaint to the Sheriff was not a general complaint that Sergeant Benson made her feel uncomfortable, but was a specific complaint about a specific behavior – Sergeant Benson's accusing her of taking the money.  Like notice about car misuse and ticket fixing, notice of this kind of misbehavior is too substantively dissimilar to put an employer on notice of the risk of sexual harassment.  Moreover, we fail to see how this kind of complaint, unlike the one in *Lockard*, would have placed upon the Sheriff a duty to inquire about "why [Ms. Kramer] felt uncomfortable," *id.* at 1074, when Ms. Kramer gave the Sheriff a specific reason for feeling uncomfortable – the fact that Sergeant Benson was accusing her of being a thief.

the County should have discovered it.  *See Turnbull*, 255 F.3d at 1244.  Pervasive

sexual harassment can suffice to create constructive notice, but it is only when the

incidents are "so egregious, numerous, and concentrated as to add up to a

campaign of harassment that the employer will be culpable for failure to discover

what is going on."  *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1346 (10th Cir.

1990) (quoting *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1422 (7th Cir.

1986)).  To impute constructive notice to the employer, the level of pervasiveness

must exceed that required to make out a prima facie hostile workplace case and

the plaintiff must point to specific facts to support such a finding of

pervasiveness-plus.  *Adler*, 144 F.3d at 675.  Ms. Kramer argues that the sexual

discussions in the jail, the sexual materials on jail computers, and the jail

harassment that she experienced – combined with Sergeant Benson's "doctor's

note" posted on the wall –  put the County on notice under a pervasiveness-plus

theory.  We cannot agree.

The facts of known harassment here are far less "egregious, numerous and

concentrated," *Baker*, 903 F.2d at 1346, than the facts in cases where we have

identified a jury question on pervasiveness-plus.  For instance, the plaintiff in

*Turnbull* was sexually assaulted by a mental patient at the hospital where she

worked.  255 F.3d at 1242.  We held that constructive notice to the hospital could

be premised on pervasiveness-plus where hospital staff were aware that "sexual

acting out" by patients was an "issue that arose regularly," a risk whose dangers

were "highlighted when a female employee was murdered by a patient" a year before the plaintiff joined the staff, and where the hospital made the plaintiff sign a form acknowledging that her job description included "the risk of assault by patients." *Id.* at 1241-42, 1244. Similarly, we found a jury question on pervasiveness-plus in *Hirase-Doi,* where the harasser was known to have harassed "at least eight to ten different women during his three month tenure" with the employer. 61 F.3d at 784.

In contrast to those cases, the facts proffered by Ms. Kramer for pervasiveness-plus do not include allegations that Sergeant Benson was previously accused of sexually harassing anyone, as were the facts in *Hirase-Doi*, or that the risk of being sexually assaulted was obvious and known to the employer, as were the facts in *Turnbull.* Nor is the conduct Ms. Kramer points to as the basis for notice – offensive materials on computers, offensive discussions, and the foot-rub note – substantively similar to the type of sexual harassment she experienced. No reasonable jury could conclude that these incidents add up to sexual harassment required to establish constructive notice. *Baker*, 903 F.2d at 1346. The record simply does not contain sufficient evidence from which a jury could find that the County had constructive notice on a pervasiveness-plus theory.

Because there is insufficient evidence to create a fact question on knowledge, we need not address the second element of the negligence inquiry, which is whether the employer responded adequately to known or constructively

known harassment. We affirm the district court's conclusion that County liability under Title VII cannot be premised on negligence.

### III

Ms. Kramer also contends the County and Sheriff Van Wagoner violated her constitutional equal protection rights. Sexual harassment under color of state law violates the Fourteenth Amendment and is therefore actionable under 42 U.S.C. § 1983. *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir.1989). But we agree with the district court that the Sheriff is entitled to qualified immunity on this claim, and that the County is not liable under § 1983 for his conduct.

### A. The district court properly granted qualified immunity to Sheriff Van Wagoner.

The qualified immunity doctrine shields government officials from individual liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). The right to be free from sexual harassment is clearly established under the Equal Protection Clause of the Fourteenth Amendment. *Starrett*, 876 F.2d at 814.

In addition to showing the existence of a clearly established right, however, Ms. Kramer must also provide "evidence of specific acts of sexual harassment . . .

that the [Sheriff] knew about and tolerated" to defeat his motion for qualified immunity. *Woodward v. City of Worland*, 977 F.2d 1392, 1398 (10th Cir. 1992). Because there are no facts in this record giving rise to an inference that the Sheriff knew about Sergeant Benson's sexual harassment of Ms. Kramer, the district court correctly granted the Sheriff's motion for summary judgment based on qualified immunity.

**B. The County is not liable for sex discrimination under § 1983.**

As to institutional liability under § 1983, the County can only be liable for the actions of Sergeant Benson if it had a custom, practice, or policy that encouraged or condoned the unconstitutional behavior – here, workplace sexual harassment. *See Monnell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691-94 (1978). The County had a policy facially forbidding sexual harassment, but Ms. Kramer contends that it nonetheless maintained "a custom or practice of sexual harassment and that Sheriff Van Wagoner acquiesced in its continuance." Aplt. Br. at 56. Unwritten customs not "formally approved by an appropriate decisionmaker" can suffice to create municipal liability if the "practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

Where the plaintiff does not contend that the municipality, directly inflicted the injury through its legislature or a "final municipal decisionmaker," but instead that a custom or policy caused one of its subordinate employees to do so, the

municipality is not automatically liable for that subordinate's actions. *Id.* at 403, 406. Unlike the standard applied to a Title VII claim, which permits recovery against the employer under vicarious liability principles if the harasser is a supervisor, the County cannot be held liable under § 1983 "solely because it employs a tortfeasor." *Brown*, 520 U.S. at 403. Instead, we must apply "rigorous standards of culpability and causation" to ensure that the municipality is held liable only for its own illegal acts and not those of subordinate employees. *Id.* at 405.

In addition to proving the existence of an impermissible custom or policy, the plaintiff must establish two additional elements: causation and state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). She must demonstrate "a direct causal link between the municipal action and the deprivation of federal rights," and she must show that the municipal action was taken with "deliberate indifference" to its known or obvious consequences. *Id.* at 769 (quoting *Brown*, 520 U.S. at 404).

As to causation, the municipality can only be found liable "where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Ms. Kramer does not argue that any County policymaker "expressly approved" Sergeant Benson's behavior. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). She appears to premise § 1983 causality on the same argument and the same facts underlying her negligence

claim – that the Sheriff knew or should have known about Sergeant Benson's sexual harassment but did not adequately act to stop it. We accordingly interpret Ms. Kramer's § 1983 causality theory as one of liability by inaction.

Where a plaintiff seeks to create § 1983 municipal liability for failing to prevent the bad acts of a subordinate, the plaintiff must show that the municipality evidenced "deliberate indifference" to the impermissible conduct. *City of Canton*, 489 U.S. at 389. It does not suffice that a prevention program has merely been "negligently administered." *Id.* at 391. Ms. Kramer must establish that the County failed to prevent sexual harassment with "deliberate indifference," that the need for more or different action was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 389-90.

On the record in this case, no reasonable jury could find that the risk of sergeants sexually assaulting their subordinates was "so obvious" the County's policymakers should have known about it. Nor would the particular risks posed by Sergeant Benson meet the obviousness threshold for the reasons we discussed when we examined Ms. Kramer's negligence claim. Because the record does not support a determination that the County was negligent, it certainly does not support a finding that the County was deliberately indifferent.

We therefore affirm summary judgment for the County on Ms. Kramer's §

1983 claims.

## IV

We REVERSE the district court's grant of summary judgment to the County on Ms. Kramer's Title VII claim with respect to Sergeant Benson's supervisor status and the County's *Faragher/Ellerth* defense. We AFFIRM in all other respects. We remand the case to the district court for further proceedings in keeping with this opinion.